**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **IN RE PSYCHEMEDICS CORP. SECURITIES LITIGATION** | No. 1:17-cv-10186-RGS |
| | <u>CLASS ACTION</u> |
| **THIS DOCUMENT RELATES TO: ALL ACTIONS** | **AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Lead Plaintiff Mary Kathleen Hermann ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following against Psychemedics Corporation ("Psychemedics" or the "Company") and Raymond C. Kubacki ("Kubacki") (collectively, "Defendants"), based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, review and analysis of press releases and other publications disseminated the Defendants and other related non-parties, a review of news articles and shareholder communications, and a review of other publicly available information concerning Defendants and related non-parties, including a translation of an Order from the 23rd Civil Court of Brasilia. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of the common stock of Psychemedics between February 10, 2014 and January 31, 2017, inclusive (the "Class Period"), seeking remedies pursuant to §§10(b) and 20(a) of the federal securities laws.

2.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations and results. Specifically, Defendants misled investors by concealing from them the fact that, through its affiliate Psychemedics Brasil Exames Toxicologicos Ltda. ("Psychemedics Brasil"), the Company participated in and benefitted from an unlawful scheme to monopolize the Brazilian hair drug test market in violation of Brazilian law. As a result, Defendants' ongoing discussion of the Company's ability to compete and expand in Brazil was misleading, and Psychemedics' record financial results in 2016 were artificially inflated by revenue derived from the unlawful monopoly.

1

3.      Psychemedics provides clinical laboratory services for the detection of drugs. Psychemedics utilizes a proprietary testing process that "digests the hair" and releases any drugs trapped in the hair, which can then be accurately measured. The Company maintains a network through which hair samples are collected and sent to Psychemedics' lab in Culver City, California, where all of the Company's hair drug tests are performed. The Company collects samples from clients in the United States and internationally.

4.      Psychemedics' international operations include a presence in Brazil.  For more than 15 years, Psychemedics Brasil has served as the Company's exclusive distributor in the country. Psychemedics Brasil competed in the Brazilian market with Laboratorios Omega Brasil Ltda. ("Omega Brasil"). Omega Brasil was the exclusive Brazilian distributor for Omega Laboratories, Inc. USA ("Omega USA").

5.      In 2013, Brazil announced a law requiring all professional drivers to pass a hair drug test when applying for license renewals. The law was to go into effect on January 1, 2014, and testing was to commence on July 1, 2014.  Psychemedics' U.S. operations had by that time reached maturity, but the mandate created an opportunity for Psychemedics to grow its revenue by increasing the number of samples it processed from Brazil.

6.      On December 3, 2013, the same day the Brazilian Federal Government announced the initial guidelines for hair drug testing of professional drivers, Psychemedics issued a press release describing its excitement about the opportunity for growth the new law created.  In the press release, Jim Dyke, Corporate VP of Sales and Marketing at Psychemedics, praised Psychemedics Brasil as a "very strong partner. . .who we have worked closely with for over 15 years[.]"  Dyke said Psychemedics Brasil had the "professionalism, experience, integrity and passion" needed to "bring positive changes to Brazil" and declared that the companies "look

forward to continuing to work together on this new opportunity" to expand Psychemedics' operations.

7.     In late 2013, Psychemedics Brasil and Omega Brasil commenced a scheme to reduce Omega Brasil's ability to compete for the anticipated growth in demand for hair drug testing resulting from Brazil's new mandate. Omega Brasil was then controlled by Diego Rodriguez Santos, whose uncle, Marcello Santos Rachlyn, was president of Psychemedics Brasil.  Omega Brasil would ensure Psychemedics Brasil obtained exclusive contracts with drug sample collection points needed to expand operations in the country.  Omega USA would thus be prevented from increasing its share of the expanding Brazilian market.  Absent competition, Psychemedics Brasil's collections could grow rapidly despite its higher-priced product, allowing the Company to profit from the illicit arrangement.

8.     Implementation of the mandate, however, did not occur on its July 1, 2014 anticipated start date as the Brazilian government considered modifications to the initial regulation.   Despite this indefinite delay, Psychemedics' public statements described the Company's continued optimism surrounding its ongoing efforts to expand in Brazil.  Indeed, on July 28, 2014, Psychemedics told investors that it had begun making "significant investments in plant, equipment and people" to handle the anticipated increased demand.

9.     According to a former Psychemedics' employee, Defendant Kubacki – Psychemedics' Chief Executive Officer - traveled to Brazil on multiple occasions during a nine-month period from mid-2014 to early 2015 to assist Psychemedics Brasil develop and expand its collection network.  Psychemedics told investors it was committing more than $6 million to expand its capacity to process drug hair samples in response to the mandate, but warned those costs would not be offset by increased revenue until the Brazilian mandate became effective.

10.     In 2015, the Brazilian government signed into law the final version of the hair drug test mandate.  In the first quarter of 2016, mandatory testing commenced.  On April 26, 2016, Psychemedics told investors that it was "already seeing a meaningful pickup of testing volume in the second quarter" from the rapidly expanding Brazilian market. Defendant Kubacki claimed Psychemedics was "aggressively competing" for business in Brazil, but failed to disclose that Psychemedics Brasil's success was driven by unlawful, anticompetitive conduct.

11.     Investors only became aware of the scheme that inflated Psychemedics' results when Brazilian law firms representing Omega USA issued a press release touting a successful litigation against the Brazilian distributors. On January 31, 2017, Figueira, Hong, Amaral, Bertoni, along with Rocha, Baptista, Advogados, issued a press release disclosing that a judge in the 23rd Civil Court of Brasilia "reviewed and upheld the termination of an exclusivity agreement and ordered O. Brazil and Psychemedics Brasil to indemnify Omega USA for, among other things, lost profit."   According to the release, the Brazilian judge found Psychemedics Brasil and Omega Brasil had "used 'cartel practices'...with a view to limit the entry and operations of new companies" in the Brazilian hair drug testing market. The release quotes the judge as saying the "practice carried out by [Omega Brasil and Psychemedics Brazil] is nothing more than a distortion aimed at undermining competition."

12.     The press release went on to say the judge's decision was based on a finding that Omega Brasil's management was motivated to act in the best interest of Psychemedics Brasil instead of Omega USA, which, according to the Brazilian court, had the unlawful effect of "reducing competition and increasing the market in favor of" Psychemedics Brasil.  As a result, Psychemedics Brasil and Omega Brasil were ordered to "indemnify [Omega USA] for lost profits" that "may total in the millions of dollars (US)."

4

13.     The announcement shocked the market and sent the price of Psychemedics' stock plummeting. Investors were well aware of the close partnership between Psychemedics and its long-term, exclusive Brazilian distributor which had been fueling record revenue records for several quarters.  After the court's ruling, investors learned Psychemedics would face legitimate competition from Omega USA in the Brazilian market for the first time since the hair drug test mandate became effective, and its share price suffered.

14.     After reaching an intraday high of $25.87 on January 31, 2017, the disclosure of the ruling from the Brazilian court and its findings against Psychemedics Brasil sent the Company's stock down to a low of $13.83 on extremely high volume. The price settled at $18.87 by the market's close, which represented a loss of more than 25 percent from its opening price.

15.     As alleged herein, Psychemedics and Defendant Kubacki knowingly concealed from investors that the Company's exclusive distributor in Brazil was conspiring with a competitor to limit market participation in Brazil. As a result, the Defendants' Class Period statements describing Psychemedics' successful Brazilian expansion, and the corresponding impact on Psychemedics' revenues and earnings, were false and misleading.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

17.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa), and 28 U.S.C. §1391(b).  Many of the false and misleading statements and omissions were made in or issued from this District.  Psychemedics' principal executive offices

are located at 125 Nagog Park, Suite 200, Acton, Massachusetts, and many of the acts and transactions giving rise to the violations of law complained of occurred in this District.

## PARTIES

18.     Plaintiff Hermann purchased Psychemedics common stock during the Class Period, as described in the Certification attached hereto and incorporated herein by reference, and suffered damages thereon.

19.     Defendant Psychemedics is a Delaware corporation with its principal executive offices located in Acton, Massachusetts.

20.     Defendant Kubacki is, and was throughout the Class Period, Psychemedics' Chief Executive Officer, President, and Chairman of the Board.

21.     During the Class Period, Defendant Kubacki served as Psychemedics' top executive and oversaw the Company's operations and finances. Defendant Kubacki was intimately knowledgeable about all aspects of Psychemedics' business operations and partnerships. Defendant Kubacki was also intimately involved in deciding which disclosures Psychemedics would make. While Psychemedics does not hold earnings calls after filing its quarterly and annual reports with the SEC, Defendant Kubacki made various public statements for Psychemedics during the Class Period.  Defendant Kubacki signed all the quarterly and annual filings made with the SEC during the Class Period, which omitted material information about the Company's operations in Brazil.

## BACKGROUND TO THE CLASS PERIOD

22.     Psychemedics is the world's largest provider of hair testing for the detection of drugs of abuse, such as marijuana, cocaine, and opiates. The Company markets its drug testing products primarily through its sales department, its distributors, and the Internet. Psychemedics

6

has international distributors in the United Kingdom, Brazil, and Turkey which serve the European, Central and South American, and Turkish markets, respectively.

23.    The Company completes the laboratory testing and analysis of all samples at two facilities in Culver City, California. To get the samples to the California testing location, Psychemedics utilizes a network of collectors who are responsible for obtaining the sample and ensuring its chain of custody throughout the testing process.  Psychemedics provides education and instruction to its collectors through a comprehensive training manual and online videos demonstrating the essential collection procedures.  Psychemedics requires its collectors to take and pass a certification exam before the Company will accept samples the collector submits.

**Psychemedics Brasil**

24.    In 2002, the Company entered into a partnership with Psychemedics Brasil by engaging Psychemedics Brasil as the Company's exclusive distributor in Brazil. Psychemedics Brasil, which refers to itself as Psychemedics' "legal representative" on its website, distributes Psychemedics' drug testing products to individuals and organizations throughout Central and South America. Psychemedics Brasil collects samples from its customers through its network of partner collection laboratories, and receives samples from customers directly through the mail. Psychemedics Brasil sends all of these samples to Psychemedics' laboratory in Culver City, California for testing.  Psychemedics then sends the results back to Psychemedics Brasil, which translates and distributes the results.

25.    On December 3, 2013, Psychemedics issued a press release in response to the new Brazilian drug test mandate being announced.  In the release, Psychemedics' VP of Sales and Marketing James Dyke discussed the Company's relationship with Psychemedics Brasil, stating in pertinent part:

> Psychemedics has a ***very strong partner*** in Psychemedics Brasil, who we have worked with closely for over 15 years helping a variety of Brazilian organizations work to achieve a drug free workplace. ***Psychemedics Brasil's level of professionalism, experience, integrity and passion to bring positive changes to Brazil is outstanding***. We look forward to ***continuing to work together*** on this new opportunity to positively impact public safety as it relates to the transportation industry.[1]

26.     In the December 3 press release, Marcello Santos Rachlyn – President of Psychemedics Brasil – was also quoted as saying: "We have been extremely pleased to work closely with Psychemedics Corporation for the past 15 years."

**Omega Brasil**

27.     In mid-2007, Omega Brasil was formed for the purpose of marketing the products offered by Omega USA in Brazil. Omega USA had no participation in the Brazilian market for toxicology testing before partnering with Omega Brasil.  On September 17, 2007, Omega USA and Omega Brasil entered a contract that defined their relationship.

28.     The contract ran for five years and contained minimum sales requirements of 500 hair drug tests for the first year, with a 25% increase each year of the contract. Omega Brasil agreed to operate an accredited network that collected hair samples and sent them to the United States for testing. Omega USA conducted the examinations and returned the results to Brazil, where Omega Brasil translated the results and delivered them to the customer.

29.     During the course of the five year contract, Omega Brasil exceeded the minimum sales targets and secured 20% of the market share for Omega USA.  On July 23, 2012, Omega USA and Omega Brasil extended their exclusivity agreement an additional 10 years and removed the sales targets.

---

[1]     All emphasis added unless otherwise noted.

**Omega Brasil and Psychemedics Brasil enter unlawful agreement to restrain trade.**

30.     The following allegations are taken from an Order of the 23rd Civil Court of Brasilia dated January 20, 2017:

31.     Shortly after its founding in 2007, Omega Brasil became the exclusive Brazilian distributor of Omega USA. Psychemedics Brasil had operated as Psychemedics' local distributor since approximately 1998.  The two distributors directly competed with each other to collect and process hair drug tests.

32.     On or before July 21, 2011, Omega Brasil amended its articles of association to remove its controlling shareholder.  Diego Santos, who was then employed by Psychemedics Brasil, obtained operational control over Omega Brasil. The contract between Omega USA and Omega Brasil, however, prohibited any change of control over Omega Brasil and required the distributor to receive written approval before any change could be effective.  Omega Brasil never notified Omega USA or obtained its consent for the change.

33.     Diego Santos maintained his employment with Psychemedics Brasil after the new contract between Omega USA and Omega Brasil was signed - at first in the technology department and then in a commercial area where he was tasked with attracting clients. Diego's uncle, Marcello Santos Rachlyn ("Rachlyn"), was the managing partner at Psychemedics Brasil at the time. Omega USA had no knowledge that Omega Brasil's controlling shareholder was employed by its competitor when the parties extended their exclusivity agreement in 2012.

34.     In late 2013, Psychemedics Brasil and Omega Brasil concocted a scheme to create a monopoly for Psychemedics Brasil that would allow Psychemedics Brasil to capture the dramatic increase in demand for hair-based drug tests.  Diego Santos left Psychemedics Brasil, where he had worked to expand its access to clients and laboratories.  Diego's control over

9

Omega Brasil would allow him to prevent Omega USA from legitimately competing with Psychemedics Brasil during the critical period when the distributors needed to expand their collection networks. The resulting monopoly would produce a windfall for Psychemedics Brasil and Psychemedics.

35.     In early 2014, Psychemedics Brasil and Omega Brasil put their plan into action. Diego was able to create the appearance that Omega Brasil was legitimately competing with Psychemedics Brasil while, in fact, he was using his authority to ensure that Psychemedics Brasil obtained exclusive collection agreements with customers. As a result, Omega USA would be frozen out of the anticipated surge in testing required by the Brazilian mandate.

36.     By September 2014, Omega USA had commenced an investigation into rumors that Omega Brasil and Psychemedics Brasil were the same company.  Omega USA noticed a decline in samples coming from Omega Brasil and, upon inspection, learned that Psychemedics Brasil operated a collection point in the same building where "Omega Brasil was practically installed side by side with its alleged competitor."  Omega USA continued to investigate the potential collusion between the Brazilian subsidiaries as implementation of the new Brazilian requirements continued to be delayed throughout 2015.

37.     In early April 2016, just when the Brazilian mandate when into effect, Omega USA notified Omega Brasil of its intent to terminate its exclusive distribution agreement because Omega Brasil had breached the contract's terms. Omega USA stated that Omega Brasil never provided notice or obtained approval for Diego Santos to assume control before the parties extended the exclusivity agreement in 2012. Omega USA indicated that it would not have entered the extended contract had it known Omega Brasil was controlled by an employee of Psychemedics Brasil.

38.     On April 7, 2016, Omega Brasil filed suit against Omega USA arguing the termination of the agreement was unlawful. The lawsuit was publicly available in Portuguese through the Brazilian court system, but was unknown to investors in the United States.  No media reports covered the filing or the allegations, and neither Psychemedics nor any of the litigants revealed the existence of the dispute.

39.     On June 16, 2016, Omega USA filed a countersuit against Omega Brasil and Psychemedics Brasil for collusion and anticompetitive practices.  In its counterclaim, Omega USA sought not only to terminate the exclusivity agreement with Omega Brasil, but also brought claims for damages for lost profits after being effectively locked out of the Brazilian market at the time the mandate took effect.  These serious allegations were not disclosed to U.S. investors.

40.     On January 20, 2017, a Brazilian judge ruled Omega Brasil had breached its contract with Omega USA in 2011 when it failed to disclose that Diego Santos had obtained control of the distributor. The judge found that Diego had conspired with Psychemedics Brasil to prevent Omega USA from expanding its sample collection network thereby denying Omega USA access to the Brazilian market. The judge ordered Omega Brasil and Psychemedics Brasil to indemnify Omega USA for certain of its lost profits resulting from the unlawful, anticompetitive conduct engaged in by the distributors.

## DEFENDANTS' CLASS PERIOD STATEMENTS

41.     The Class Period begins February 10, 2014 when Psychemedics issued a press release announcing its first quarter and year-end results for the period ended December 31, 2013. For the quarter, Psychemedics reported net income of $870,000, or $0.16 per diluted share, on revenue of $6.48 million, compared to net income of $270,000, or $0.05 per diluted share, on revenue of $5.66 million for the same period in the prior year. For fiscal year 2013,

Psychemedics reported net income of $3.81 million or $0.72 per diluted share, on revenue of $26.87 million, compared to net income of $2.98 million, or $0.57 per diluted share, on revenue of $25.22 million for fiscal year 2012.

42.     The February 10 press release contained a quote attributed to Defendant Kubacki regarding Psychemedics efforts to expand its Brazilian operations, which stated:

> With regard to new business, in December 2013, the Company noted that the Brazilian Federal Government had announced new guidelines that will require professional drivers in the transportation industry to pass a hair drug test when obtaining or renewing their driver's license. The first testing is expected to begin on July 1, 2014. **We are excited about competing for the hair testing business in Brazil.**

43.     The statement referenced above in ¶42 was materially false and misleading.  At the time the statement was made, Psychemedics' top executives were working closely with Psychemedics Brasil and were intently focused on expanding the Company's operations in response to the Brazilian mandate.  Psychemedics Brasil had already commenced its scheme to deny its competitor, Omega Brasil, access to the expanding Brazilian marketplace. Psychemedics concealed from investors the fact that its Brazilian expansion would benefit from its exclusive distributor's anticompetitive practices, which violated Brazilian law.

44.     In the February 10, 2014 press release, Defendant Kubacki emphasized the Company's close relationship with Psychemedics Brasil, stating in relevant part:

> Psychemedics has a very strong partner in Psychemedics Brasil, a Brazilian-owned independent distributor **who we have worked closely with for over 15 years** helping a variety of Brazilian organizations work to achieve a drug free workplace. We look forward to **continuing to work together on this new opportunity** to positively impact public safety as it relates to the transportation industry.

45.     The February 10 press release also described Psychemedics' commitment to spend significant resources pursuing the Brazilian opportunity.  Defendant Kubacki is quoted as saying:

> We are very excited about this opportunity and believe the potential volume from this Brazil opportunity could be very substantial. ***In order to service that potential volume, we need to make significant investments in plant, equipment and people. These investments must be made in the first half of 2014 to be ready for the July 1 start date.*** During this period, we will not have any revenues from this Brazil opportunity to offset these costs. Therefore, we would expect earnings in the first half of 2014 to be unfavorably impacted.

46.     Over the next few days investors poured into the stock, driving its share price from a low of $15 on February 10, 2014 to a high of $18.66 on February 13, 2014 with volume spiking to approximately 147,500 (up from 5,800 shares traded on February 7, 2014).

47.     On February 28, 2014, Psychemedics filed its annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2013 (the "2013 10-K"). In the 2013 10-K, Psychemedics stated in pertinent part:

> **Competition**
>
> The Company competes directly with numerous commercial laboratories that test for drugs primarily through urinalysis testing. Most of these laboratories, such as Quest Diagnostics, have substantially greater financial resources, market identity, marketing organizations, facilities, and more personnel than the Company. The Company has been steadily increasing its base of corporate customers and believes that future success with new customers is dependent on the Company's ability to communicate the advantages of implementing a drug program utilizing the Company's patented hair analysis method. The Company's ability to compete is also a function of pricing. The Company's prices for its tests are generally somewhat higher than prices for tests using urinalysis. However, the Company believes that its superior detection rates, coupled with the customer's ability to test less

frequently due to hair testing's wider window of detection (several months versus approximately three days with urinalysis), provide more value to the customer. This pricing policy could, however, lead to slower sales growth for the Company. ***The Company also competes with other hair testing laboratories. The Company distinguishes itself from hair testing competitors by emphasizing the superior results the Company obtains through use of its unique patented extraction method*** (getting drug out of the hair), ***in combination with the Company's FDA cleared immunoassay screen***. In addition, Psychemedics is the only laboratory with FDA clearance for a fivedrug panel test that is not limited to head hair samples for drugs of abuse. To date, no other laboratory engaged in hair testing has received approval or clearance from the FDA on all of its assays for the testing of both head and body hair samples (two other laboratories have either partial FDA clearance or clearance specific to head hair samples only).

48.     The 2013 10-K contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendant Kubacki stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

49.     The statement referenced above in ¶47 was materially false and misleading.  At the time Defendants claimed Psychemedics' patented extraction process provided it a competitive advantage, Psychemedics Brasil had manipulated the market by commencing a scheme to deny its competitor, Omega Brasil, access to the expanding Brazilian marketplace.

50.     On April 29, 2014, Psychemedics issued a press release announcing its first quarter financial results for the period ended March 31, 2014. The Company's revenue for the quarter was $7.0 million compared to $6.4 million for the quarter ended March 31, 2013. Net income for the quarter ended March 31, 2014 was $756,000, or $0.14 per diluted share, versus $822,000, or $0.16 per diluted share, for the comparable period the year before.

51.     In discussing the Company's opportunity to grow its operations in Brazil, Defendant Kubacki was quoted in the April 29, 2014 press release as saying:

In late 2013, *we reported that the Company will be competing for hair testing business in Brazil in 2014*. As you may recall, the Brazilian Federal Government had announced new regulations that will require professional drivers in the transportation industry to pass a hair drug test when obtaining or renewing their driver's license, with the first testing to begin on July 1, 2014.

52.     The statement referenced above in ¶51 was materially false and misleading. Defendants falsely stated that it was "competing for hair testing business in Brazil" when, in fact, Psychemedics Brasil was conspiring with Omega Brasil to obtain a monopoly in the Brazilian market thereby eliminating legitimate competition. By this time, Omega USA had already commenced an investigation into rumors that Psychemedics Brasil and Omega Brasil were the same company.

53.     In the April 29, 2014 press release, Defendant Kubacki also described the Company's financial commitment to expanding its ability to process the increased number of samples anticipated as a result of the new Brazilian mandate and the significant impact those efforts would have on the Company's short-term performance:

This is an exciting opportunity. As we have also stated, *in order to service this potential volume, we are making significant investments in plant, equipment and people.* These investments are being made *in the first half of 2014* to be ready for the start date. During this period, we will not have any revenues from this Brazil opportunity to offset these costs. Therefore, we would expect earnings in the first half of 2014 to be unfavorably impacted.

The impact in the first quarter of 2014 was estimated at $0.04 per diluted share, including the R&D costs to develop three additional new drug tests for Brazil requirements. However, the greater portion of these expenses will occur in the second quarter, so we expect the impact on earnings to be significantly greater in the second quarter.

At the same time, *the project also requires additional capital for equipment*. As a result, *the Company entered into an equipment financing arrangement which will allow the Company,* at its

option, *to finance up to $6 Million of equipment purchases*. In this quarter, the Company borrowed $1.1 million under this financing arrangement at a 2.15% interest rate. *We still have $2.2 million in cash on our balance sheet* and approximately $5 million additional equipment financing available.

*While increasing capacity will have a negative impact on our cash flow, we believe this to be short-term.*

54.     On May 1, 2014, Psychemedics filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2014 (the "Q1 2014 10-Q"). The Q1 2014 10-Q contained a SOX certification by Defendant Kubacki stating that the financial information contained in the Q1 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

55.     On July 28, 2014, Psychemedics issued a press release titled "Psychemedics Corporation announces record revenues." For the quarter, Psychemedics reported net income of $860,000, or $0.16 per diluted share, on revenue of $7.69 million, compared to net income of $1.06 million, or $0.20 per diluted share, on revenue of $6.90 million for the same period in the prior year.  In the news release, Defendant Kubacki discussed the Company's opportunity to expand in Brazil, stating in relevant part:

As we previously noted, *the Company will be competing for hair testing business in Brazil.* The Brazilian Federal Government had announced new regulations that will require professional drivers in the transportation industry to pass a hair drug test when obtaining or renewing their driver's license.

56.     The statement referenced above in ¶55 was materially false and misleading. At the time the statement was made, Psychemedics Brasil had expanded its collection network through an unlawful conspiracy with Omega Brasil, resulting in an absence of legitimate competition in the Brazilian market. According to former a Psychemedics' employee (described more fully below), Defendant Kubacki was involved in assisting Psychemedics Brasil setting up

its collection network and traveled to the country in mid-2014 for that purpose. Again, Omega USA had, by this time, been investigating rumors Psychemedics Brasil and Omega Brasil were the same company for several months.

57.     In the July 28, 2014 press release, Kubacki also discussed delays in the implementation of the new mandate, but stressed the delay was driven by the Brazilian government's desire to increase the demands of the new mandate. Defendant Kubacki was quoted in relevant part as stating:

> *The testing was slated to begin July 1, 2014. We now understand the government will be moving the start date for testing.*
>
> However, the more important significant news is that the Brazilian Congress has included in a broader transportation bill, *a requirement that professional drivers be drug tested on a more rigorous basis than the requirements under the prior regulation, utilizing technology that is favorable to hair testing.* Once the bill becomes law, it would go into effect 90 days after the President's signature and official publication. *It appears that the implementation of the existing regulation has been delayed to coordinate with the new proposed law. If the bill does not become law, the existing regulation would remain in effect, and would be implemented on a time table to be determined.*

58.     In the July 28, 2014 press release, Defendant Kubacki went on to describe the negative impact the delay would have on Psychemedics' financial results, which were originally expected to have a positive impact on the quarter:

> *Because of the Brazil opportunity, we also noted that we expected earnings in the first half of 2014 to be unfavorably impacted by additional costs required to increase capacity related to this significant opportunity, with the greater proportion coming in the second quarter.* We estimate that the impact on second quarter earnings was about $0.08 per share. This is less than expected as we adjusted our hiring schedule. However, due to the change in timing of this opportunity, *we now expect the ramp-up of our hiring to have some impact on our third and fourth quarter earnings.*

59.     Defendant Kubacki also confirmed in the July 28, 2014 press release that Psychemedics had already commenced its efforts to expand capacity in anticipation of the increased demand from Brazil, stating in relevant part:

> This is an exciting opportunity. In addressing the capital requirements for this opportunity, in the second quarter of 2014, the Company borrowed $4.9 million of equipment financing as part of a financing arrangement made in the first quarter. This brings the total amount borrowed to $6.0 million at a very favorable interest rate of 2.15%. **With the additional leased space and over $6 million spent on equipment and leasehold improvements, the Company has significantly increased its production capacity to handle future growth."**

60.     On July 30, 2014, Psychemedics filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 10-Q").  The Q2 2014 10-Q contained a SOX certification by Defendant Kubacki stating that the financial information contained in the Q2 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

61.     On October 30, 2014, announced its third quarter financial results for the quarter ended September 30, 2014.  For the quarter, Psychemedics reported net income of $920,000, or $0.17 per diluted share, on revenue of $7.70 million, compared to net income of $1.05 million, or $0.20 per diluted share, on revenue of $7.06 million for the same period in the prior year.  In the press release, Defendant Kubacki confirmed that the "project to increase capacity through additional leased space and over $7 million of new equipment and leasehold improvements is now complete."  Kubacki said the expansion was "driven primarily by an opportunity in Brazil."

62.     Defendant Kubacki also described in the October 30 press release the negative impact further delays in the implementation of the Brazilian mandate had on Psychemedics' results, but expressed optimism that the opportunity would eventually be realized:

> *While this mandated testing has not yet become effective, we currently expect it will become a requirement in 2015, as there is both a proposed bill in the Brazilian Congress, as well as an existing regulation (the implementation of which was deferred once the legislative bill was introduced), that provide for mandatory drug testing of professional drivers.*
>
> We remain excited about this opportunity in Brazil. We estimate that the impact on third quarter earnings from the increase in capacity and other costs related to the Brazil opportunity was about $0.07 per share.

63.     On October 31, 2014, Psychemedics filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 10-Q"). The Q3 2014 10-Q contained a SOX certification by Defendant Kubacki stating that the financial information contained in the Q3 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

64.     On February 10, 2015, Psychemedics announced its financial results for its fourth quarter and year-end financial results for the period ended December 31, 2014.  For the quarter, Psychemedics reported net income of $680,000, or $0.13 per diluted share, on revenue of $6.76 million, compared to net income of $870,000 or $0.16 per diluted share, on revenue of $6.48 million for the same period in the prior year. For fiscal year 2014, Psychemedics reported net income of $3.21 million or $0.60 per diluted share, on revenue of $29.21 million, compared to a net income of $3.81 million, or $0.72 per diluted share, on revenue of $26.87 million for fiscal year 2013.  Implementation of the Brazilian mandate continued to be delayed, and costs associated with Psychemedics expanding its capacity negatively impacted quarterly results.

65.     On February 27, 2015, Psychemedics filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2014 (the "2014 10-K"). In the 2014 10-K, Psychemedics stated in part:

**Competition**

\*\*\*\*

*The Company also competes with other hair testing laboratories. The Company distinguishes itself from hair testing competitors by emphasizing the superior results the Company obtains through use of its unique patented extraction method* (getting drug out of the hair), *in combination with the Company's FDA cleared immunoassay screen.*

66.     The statement referenced above in ¶65 was materially false and misleading. Psychemedics Brasil was not, in fact, legitimately competing in the Brazilian market but was instead set to benefit from the unlawful conspiracy between Psychemedics Brasil and Omega Brasil.  By this time, Omega USA had confirmed that the two distributors operated collection points from the same building and that there existed a familial relationship between Omega Brasil's controlling shareholder and Psychemedics Brasil's managing partner. Defendant Kubacki had, by this time, traveled as many as three times to Brazil to assist Psychemedics Brasil set up its collection network, but Psychemedics' public statements concealed these facts.

67.     The 2014 10-K contained a SOX certification by Defendant Kubacki stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

68.     On April 27, 2015, Psychemedics announced its third quarter financial results for the quarter ended March 31, 2015. For the quarter, Psychemedics reported net income of $280,000, or $0.05 per diluted share, on revenue of $6.76 million, compared to net income of $760,000, or $0.14 per diluted share, on revenue of $7.05 million for the same period in the prior

year.  Defendant Kubacki included the following statement in the April 27, 2015 press release

about the Company's continued expenditures needed to handle the increased samples anticipated

from Brazil, while discussing further delays in the mandate's implementation:

> As I have previously reported, we believe we have a very exciting
> opportunity in Brazil. The Brazilian Federal Government had
> passed regulations that would require professional drivers in the
> transportation industry to pass a hair drug test when obtaining or
> renewing their driver's license. This testing was to begin in July
> 2014, but was delayed while a proposed law that required drivers
> be drug tested on a more rigorous basis than the requirements
> under the regulation was being considered. ***As we noted in our
> 2014 annual report, the law has now passed by the Brazilian
> Congress and signed by the President in March 2015, and testing
> is expected to begin in June 2015.***
>
> This is an exciting opportunity. However, in order to service this
> potential volume, ***we have made significant investments in plant,
> equipment and people. The impact from these investments in the
> first quarter of 2015 was estimated at $0.05 per diluted share.***
> Earnings were also impacted by an increased investment in Sales
> & Marketing, with additional personnel and additional support for
> strategic information systems.

69.    On May 1, 2015, Psychemedics filed a quarterly report on Form 10-Q with the

SEC announcing the Company's financial and operating results for the quarter ended March 31,

2015 (the "Q1 2015 10-Q").  The Q1 2015 10-Q contained a SOX certification by Defendant

Kubacki stating that the financial information contained in the Q1 2015 10-Q was accurate and

disclosed any material changes to the Company's internal control over financial reporting.

70.    On July 28, 2015, Psychemedics announced its financial results for the quarter

ended June 30, 2015.  For the quarter, Psychemedics reported net income of $250,000, or $0.05

per diluted share, on revenue of $7 million, compared to net income of $860,000, or $0.16 per

diluted share, on revenue of $7.69 million for the same period in the prior year.

71.     In the July 28, 2015 press release, Defendant Kubacki was again forced to discuss

delays with Brazil's planned commencement of mandatory hair drug testing, stating:

> As previously reported, the Brazilian government passed a law, signed by the President on March 2nd, that requires professional drivers in the transportation industry to pass a hair drug test when obtaining and renewing their driver's license. ***The law stated that testing was to begin ninety days after the law was signed, which would have meant June 1st. Testing has not yet begun due to administrative delays.*** While this delay is disappointing, this is a law and the legal mandate remains in effect, so we expect testing to begin in the near future.
>
> We believe this Brazil opportunity is truly exciting despite the short-term impact --- $0.09 per diluted share on earnings in the second quarter from staffing ramp-up costs ($0.06) to meet the stated June 1 start date and increased lab space ($0.03). However, we have subsequently reduced our staffing based on the delay. ***This Brazil opportunity is significant with a very favorable risk/reward. It has just been delayed near-term.***

72.     The statement referenced above in ¶71 was materially false and misleading.  At

the time the statement was made, the Brazilian market had been manipulated in favor of

Psychemedics. Defendants' statement describing the "favorable risk/reward" opportunity in

Brazil, however, failed to disclose the fact that Psychemedics' operations were set to benefit

from Psychemedics Brasil's anticompetitive scheme and omitted any discussion of the material

risks the Company faced as a result of the unlawful conduct.

73.     On July 31, 2015, Psychemedics filed a quarterly report on Form 10-Q with the

SEC announcing the Company's financial and operating results for the quarter ended June 30,

2015 (the "Q2 2015 10-Q").  The Q2 2015 10-Q contained a SOX certification by Defendant

Kubacki stating that the financial information contained in the Q2 2015 10-Q was accurate and

disclosed any material changes to the Company's internal control over financial reporting

74.     On October 28, 2015, Psychemedics announced its financial results for the quarter ended September 30, 2015. For the quarter, Psychemedics reported net income of $800,000, or $0.15 per diluted share, on revenue of $7.08 million, compared to net income of $920,000, or $0.17 per diluted share, on revenue of $7.70 million for the same period in the prior year.

75.     On October 29, 2015, Psychemedics filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q"). The Q3 2015 10-Q contained a SOX certification by Defendant Kubacki stating that the financial information contained in the Q3 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

76.     On February 10, 2016, Psychemedics announced its fourth quarter and year-end results for the period ended December 31, 2105. The Company's revenue for the year ended December 31, 2015 was $27.0 million versus $29.2 million for the twelve months ended December 31, 2014, a decrease of 8%. Net income for the twelve months ended December 31, 2015 was $1.5 million or $0.28 per diluted share, versus $3.2 million or $0.60 per diluted share, for the comparable period last year, a decrease of 53%. The Company's revenue for the quarter ended December 31, 2015 was $6.1 million versus $6.8 million for the quarter ended December 31, 2014, a decrease of 9%. Net income for the quarter ended December 31, 2015 was $185,000, or $0.03 per diluted share, versus $676 thousand or $0.13 per diluted share, for the comparable period last year, a decrease of 73%.

77.     On February 26, 2016, the Company filed its Form 10-K with the SEC for year ended December 31, 2015 ("2015 10-K"). The 2015 10-K extensively discussed the Company's competitive outlook, stating, in pertinent part, as follows:

The Company's ability to compete is also a function of pricing. The Company's prices for its tests are generally somewhat higher than prices for tests using urinalysis. . . . This pricing policy could, however, lead to slower sales growth for the Company.

The Company also competes with other hair testing laboratories. ***The Company distinguishes itself from hair testing competitors by emphasizing the superior results the Company obtains through use of its unique patented extraction method*** (getting drug out of the hair), in combination with the Company's FDA cleared immunoassay screen.

****

***Increased competition, including price competition, could have a material impact on the Company's net revenues and profitability***.

Our business is intensely competitive, both in terms of price and service. Pricing of drug testing services is a significant factor often considered by customers in selecting a drug testing laboratory. As a result of the clinical laboratory industry undergoing significant consolidation, larger clinical laboratory providers are able to increase cost efficiencies afforded by large-scale automated testing. This consolidation results in greater price competition. The Company may be unable to increase cost efficiencies sufficiently, if at all, and as a result, its net earnings and cash flows could be negatively impacted by such price competition. ***The Company may also face increased competition from companies that do not comply with existing laws or regulations or otherwise disregard compliance standards in the industry.***

78.    The statements referenced above in ¶77 were materially false and misleading.  At the time the statement was made, Psychemedics Brasil had obtained an effective monopoly over the Brazilian market though the use of exclusive contracts with collection sites and would not face legitimate competition.  Defendant Kubacki had, by this time, traveled to Brazil at least three times to assist Psychemedics Brasil set up its collection network.  Defendants, however, failed to disclose that Psychemedics' exclusive distributor in Brazil, not its competitors, was engaged in unlawful, anticompetitive conduct that would ***benefit*** the Company.

24

79.     Instead, the 2015 10-K discussed the risk and uncertainties the Company was, and would continue to be, subject to while concealing the fact that its exclusive Brazilian distributor was engaging in unlawful, anticompetitive practices. The full text of the warning read:

> The Company is subject to a number of risks and uncertainties similar to those of other companies, such as those associated with the continued expansion of the Company's sales and marketing network, technological developments, intellectual property protection, development of markets for new products and services offered by the Company, the economic health of principal customers of the Company, financial and operational risks associated with expansion of testing facilities used by the Company, government regulation (including, but not limited to, Food and Drug Administration regulations, Brazilian laws, proposed laws and regulations, and delays in implementation of laws and regulations), competition and general economic conditions.

80.     Psychemedics' statements that it would soon benefit from an expanded Brazilian market had a positive effect on its stock price.  The stock climbed off its January lows and reached a high of $14.37 on March 18, 2016.

81.     On April 26, 2016, Psychemedics issued a press release announcing its financial results for the quarter ended March 31, 2016. The Company's revenue for the quarter ended March 31, 2016 was $6.7 million versus $6.8 million for the quarter ended March 31, 2015, a decrease of 1%. Net loss for the quarter ended March 31, 2016 was $23,000 or $0.00 per share, versus net income of $278,000 or $0.05 per diluted share, for the comparable period last year. The decline in performance was blamed on the costs associated with the Company's Brazilian expansion.

82.     In the April 26, 2016 press release, Defendant Kubacki emphasized that the Brazilian mandate had begun to positively impact the number of samples Psychemedics was collecting and testing.  Defendant Kubacki stated, in pertinent part, as follows:

> While our bottom line was also impacted by the on-going capacity expansion and ramp up costs related to anticipated new business from Brazil, ***the good news is that the Brazil legislated testing, requiring professional drivers in the transportation industry to pass a hair drug test, has started***.  As we anticipated, the ramp up period is more gradual as this is a major new program and some of the states in Brazil are requiring additional time to implement the law.  In addition, the requirement to test professional drivers when being hired or fired was delayed to April 16, 2016.  As a result, there were a relatively small number of tests received at the end of March 2016, but ***we are already seeing a meaningful pickup of testing volume in the second quarter.***
>
> "***We are excited about this opportunity in Brazil and are aggressively competing for a share of this potential business***.  As a result, we had additional ramp up costs in the quarter to support the anticipated new business which had a negative effect on Q1 2016 profitability. The estimated impact on the quarter earnings from the increase in capacity and ramp up costs related to the Brazil opportunity was about $0.10 per share.

83.     The statements referenced above in ¶82 were materially false and misleading.  Before this statement was issued, Omega USA had notified Omega Brasil that it intended to terminate the exclusivity contract as a result of Omega Brasil's unauthorized change of control in 2011, and on April 7, 2016, Omega Brasil had filed suit in Brazilian court arguing Omega USA's termination of the exclusivity agreement was improper.  The complaint, which was publicly available in Portuguese through the Brazilian court system, was unknown to investors or the market. Psychemedics failed to disclose these allegations or the existence of the litigation making its discussion of competition and increased sample collection from Brazil false and misleading.

84.     On April 28, 2016, Psychemedics filed its first quarter Form 10-Q with the SEC ("Q2 2016 10-Q"). The Company cited "no material changes in [its] risk factors" from the 2015 10-K. The Company reported a one percent decrease in revenue compared to the first quarter of 2015. The Company attributed this decrease to the ongoing costs of increasing its presence in Brazil, stating in pertinent part as follows:

> The decrease in earnings was a result of ongoing capacity expansion and ramp up costs in anticipation of future testing volumes from an opportunity in which the Brazilian government has mandated drug testing for professional drivers. While some testing from this Brazil opportunity started in March, the law was not fully implemented as of March 31, 2016.

85.     On July 26, 2016, Psychemedics issued an earnings release announcing its second quarter 2016 financial results. The Company's revenue for the quarter ended June 30, 2016 was $9.7 million versus $7.0 million for the quarter ended June 30, 2015, an increase of 39%. Net income for the quarter ended June 30, 2016 was $1.6 million or $0.30 per diluted share, versus $252,000, or $0.05 per diluted share, for the comparable period last year, an increase of 547%.

86.     In the July 26, 2016 press release, Defendant Kubacki lauded the Company's earnings and emphasized that reported revenue was the highest in the Company's history, stating as follows:

> *We are very pleased to report the highest revenue and earnings for any quarter in the Company's history.  The growth has been driven by our international business, specifically an opportunity in Brazil as noted below*.
>
> ****
>
> *We have noted since 2013 a significant opportunity in Brazil, and are very pleased to begin to see the results of our efforts and the efforts of our exclusive independent Brazilian distributor, Psychemedics Brasil. This opportunity is to compete for the testing of drugs of abuse required for professional drivers in Brazil.* As of March 2016, testing for this opportunity had begun

27

and is being phased in as some states have required additional time
to implement the law.

87.     In response to this release, on July 27, 2016 the Company's stock price jumped to

an intraday high of $19.23, off of its previous close of $13.89, with more than a 3,000% increase

in trading volume.

88.     The statements referenced above in ¶86 were materially false and misleading.  At

the time the statement was made, Omega USA had filed a counter claim in Brazilian court

detailing the conspiracy between Omega Brasil and Psychemedics Brasil to prevent Omega USA

from entering the expanding market in Brazil. These allegations, and the existence of the

litigation, were material facts Psychemedics was required to disclose.  Psychemedics' omission

left the market unaware that the positive assessment presented by Defendants masked the true

risks facing the Company's Brazilian expansion, including the likelihood of increased

competition from Omega USA – and the absence of competition in the first place.

89.     On July 28, 2016, Psychemedics filed its second quarter Form 10-Q with the SEC.

The Company again cited "no material changes in [its] risk factors" from the 2015 10-K. The

Company reported incredible earnings for its size, with increases in net income of more than

$1.3 million, earnings per share of $0.30, and an increase in revenue of more than $2.7 million,

as compared to the second quarter in 2015. The Company attributed these numbers to the rapid

growth in its international business segment, namely through its exclusive distributor

Psychemedics Brasil, stating, in pertinent part, as follows:

> The increase in revenue and earnings was ***primarily the result of
> higher testing volume from Brazil***. The Brazil opportunity derived
> from the implementation of a recently passed Brazilian law
> requiring a hair drug test for all professional drivers in the country
> that began to take effect in March 2016.

****

> Revenues were $9.7 million for three months ended June 30, 2016 compared to revenues of $7.0 million for the three months ended June 30, 2015, representing an increase of 39%. ***The increase was attributable to testing volume from Brazil.***

90.　　The statements referenced above in ¶89 were again materially false and misleading. The statements omitted any mention of the ongoing Brazilian litigation or the conspiracy between Omega Brasil and Psychemedics Brasil, which rendered the positive statements misleading.

91.　　The Q2 2016 10-Q contained a SOX certification by Defendant Kubacki stating that the financial information contained in the Q2 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

92.　　On October 26, 2016, Psychemedics issued a press release announcing its third quarter 2016 financial results for the reporting period ended September 30, 2016. The Company's revenue for the quarter ended September 30, 2016 increased 67% to $11.8 million, from $7.1 million for the quarter ended September 30, 2015. Net income for the quarter ended September 30, 2016 increased 240% to $2.7 million or $0.49 per diluted share, from $796,000, or $0.15 per diluted share, for the comparable period last year.

93.　　The October 26, 2016 press release emphasized record revenues and a positive outlook for the rest of fiscal year 2016, quoting Defendant Kubacki, in pertinent part, as follows:

> ***For the second quarter in a row, we had record sales and earnings for any quarter in the Company's history. The growth has been driven by our international business, specifically professional driver testing in Brazil.***

> "We have noted since 2013 a significant opportunity in Brazil, and are very pleased to see the results of our efforts and the efforts of our exclusive independent Brazilian distributor, Psychemedics Brasil. ***This opportunity is to compete for the testing of drugs of abuse required for professional drivers in Brazil.***

> "In the second quarter of this year, we noted that testing for drugs of abuse for professional drivers in Brazil had begun. We also noted that some of the Brazilian states had required additional time to implement the law. *In this quarter, we had virtually all of the states begin testing and this had a very positive impact on the revenue and earnings for the quarter*.

94.     Following this release, on October 27, 2016 the Company's stock price rose to an intraday high of $24.70, off of its close the previous day of $19.67, with more than a 835% increase in trading volume.

95.     The statements referenced above in ¶93 were materially false and misleading. The Defendants again failed to disclose the allegations of a conspiracy between Omega Brasil and Psychemedics Brasil. Defendants' discussion of record revenues while omitting any discussion of the risks inherent in the pending litigation rendered the statements misleading.

96.     On October 27, 2016, the Company filed its third quarter Form 10-Q with the SEC. The Company experienced impressive earnings due to the Brazilian law requiring truck drivers to undergo mandatory drug testing. The Company reported an increase in net income of more than $2.7 million, earnings per share of $0.50, and an increase in revenue of more than $4.7 million, as compared to the third quarter in 2015. The Company again attributed these numbers to the increasing success and growth of Psychemedics Brasil, with Defendant Kubacki stating, in pertinent part, as follows:

> Revenues for the third quarter of 2016 were $11.8 million, an increase of 67% from third quarter 2015 revenue of $7.1 million. The Company reported net income of $2.7 million, or $0.49 per diluted share for the three months ended September 30, 2016 versus $796 thousand, or $0.15 per diluted share for the same period in 2015, an increase of 240%. *The increase in revenue and earnings was primarily the result of higher testing volume from Brazil.*

97.     The statement referenced above in ¶96 was materially false and misleading. The statements omitted any mention of lawsuit pending in Brazil or the conspiracy between Omega Brasil and Psychemedics Brasil. Defendants touted increased revenues without any discussion of the pending litigation or the allegations contained therein, which rendered the statements misleading.

## THE TRUTH IS REVEALED

98.     On January 31, 2017, *Bloomberg* reported that a Brazilian judge ordered Psychemedics Brasil to compensate Omega USA for losses caused by anticompetitive practices that had the effect of "preventing other companies from accessing [the] market." The *Bloomberg* article further reported that Psychemedics Brasil may be further investigated by Brazil's Administrative Council for Economic Defense for engaging in "cartel practices" in an attempt to form a drug test monopoly.

99.     The *Bloomberg* report was based on a press release from Brazilian law firms which indicated that a Brazilian court had found Psychemedics Brasil in violation of Brazilian anti-competition laws. The release stated as follows:

> SAO PAULO, Jan. 31, 2017 /PRNewswire/ -- Psychemedics Brasil Exames Toxicologicos Ltda. (Psychemedics Brazil) and Laboratorios Omega Brasil Ltda. (O. Brazil) were ordered on January 20th, 2017 to compensate Omega Laboratories, Inc. USA for *losses caused by anticompetitive practices used for the purpose of "preventing other companies from accessing (the) market."* . . . According to the court ruling, the indemnification may total in the millions of dollars (US).
>
> In a recent decision, the judge of the 23rd Civil Court of Brasilia reviewed and upheld the termination of an exclusivity agreement and ordered O. Brazil and Psychemedics Brazil to indemnify Omega USA, for among other things, lost profits.
>
> After the submission of an overwhelming amount of evidence and testimony, *the judge's ruling found that O. Brazil sought out an*

31

*exclusive partnership with Omega USA with false claims to represent and sell Omega USA's hair drug testing to the Brazilian market, when in fact the agreement was intended to lock out Omega USA's access to the market.*

When Omega USA terminated this deceptive agreement with O. Brazil, O. Brazil filed lawsuits against them to further prevent their entrance into the market. *By locking Omega USA out of the market, Psychemedics Brazil was free to operate with limited competition.*

****

*The ruling notes that Psychemedics Brazil and O. Brazil used "cartel practices," in an attempt to form a drug testing monopoly which included unenforceable and exclusive contracts with collection sites, "all with a view to limit the entry and operation of new companies in the market." The court ruling further asserts that "The practice carried out by (O. Brazil) and Psychemedics (Brazil) is nothing more than a distortion aimed at undermining competition."*

Court documents revealed that O. Brazil is "controlled by the nephew of the majority partner of Psychemedics Brazil." As a result of this, Omega USA was not permitted to sell their services due to O. Brazil and Psychemedics Brazil, *"reducing competition and increasing the market in favor of the latter."*

The ruling states that O. Brazil must immediately "refrain from using the Omega brand in any form in all its products, services, roles and forms, including its corporate name and internet domain, under penalty of a daily fine of R $ 5,000.00 (five thousand reais)."

****

This ruling also ordered O. Brazil and *Psychemedics Brazil "to indemnify Omega Laboratories Inc (Omega USA) for loss of profits," among other damages.* While the final amount has not yet been released, the ruling states that "profits relating to these examinations shall be passed on to Omega USA as compensation for lost profits." *It is currently expected that this indemnification may total in the millions of dollars (US).*

The ruling also indicated that there may be further investigation of Psychemedics Brazil and O. Brazil by Brazil's Administrative Council for Economic Defense (CADE).

32

100.    Psychemedics issued a press release that same day in response to the report. Psychemedics clarified that it was not a party in the lawsuit, but acknowledged that "Psychemedics Brasil has been a distributor of Psychemedics Corporation's hair testing services for more than fifteen years."  Despite the court's ruling, Defendants told investors that the Company expected its business in Brazil to "continue as usual."

101.    In response to the report on January 31, 2017, the Company's stock price dropped 26% with more than a 5,000% increase in trading volume compared to the previous day. On January 31, 2017, Psychemedics stock price reached an intraday high of $25.87 before falling to just $13.81 after the disclosure of the judgment against Psychemedics Brasil.  The stock closed that day at $18.87 with more than 1.2 million shares being traded.

### POST-CLASS PERIOD STATEMENTS

102.    On February 6, 2017, Psychemedics announced its fourth quarter and year-end financial results for the period ended December 31, 2016. Defendant Kubacki discussed the record revenues the Company reported and downplayed the relevance of the Brazilian judgment against Psychemedics Brasil, stating, in pertinent part, as follows:

> Regarding the recent swing in our stock price, it is important to note the following: the "news" story which precipitated the gyration in our stock was a press release put out by Omega Laboratories' Brazilian lawyers; it was a PR piece that contained speculation (e.g. no amount of money was mentioned in the decision) and it involved a case from a lower court in Brazil that is being appealed by our Brazilian-owned independent distributor; PMD is not a party to the case and to imply otherwise is totally misleading and untrue.

> ****

> We have always been committed to fair competition in the marketplace. We rely on the quality of our test and not PR.

33

103.     Defendant Kubacki's statement in the February 6, 2017 press release is a designed attempt to minimize the impact of the judgment and its chilling effect upon Psychemedics; namely, that Psychemedics' exclusive distributor in its most important, revenue producing market is prohibited by law from operating as it had in the past when it enjoyed an illegal monopoly over the market.

104.     On March 7, 2017, Psychemedics filed its Form 10-K with the SEC for year ended December 31, 2016 ("2016 10-K").   For the first time, Psychemedics disclosed that Psychemedics Brasil was a "significant customer" of the Company because it exceeded 10% of the Company's revenue for the year ended December 31, 2016.   No customer, including Psychemedics Brasil, had contributed more than 10% to the Company's revenue in the preceding three years.

105.     The 2016 10-K also confirmed the importance of Psychemedics' Brazilian expansion, stating in relevant part:

> Revenue increased $12.0 million or 45% to $39.0 million in 2016 compared to $27.0 million in 2015. ***This increase was driven entirely from new business in Brazil.*** The volume and average revenue per sample for the domestic business was essentially flat from 2015 to 2016.

106.     The 2016 10-K acknowledged that Psychemedics' "opportunity in Brazil is subject to price pressures as this is a new market ***with new competitors entering the market***."

107.      The 2016 10-K included a new risk factor that had not been included in any of its prior annual filings. The factor warns about the risks of operating internationally and in compliance with foreign laws and states as follows:

> ***We are subject to numerous political, legal, operational and other risks as a result of our international operations which could impact our business in many ways.***

Although we conduct most of our business in the United States, our international operations increase our exposure to the inherent risks of doing business in international markets. Depending on the market, these risks include without limitation:

- changes in the local economic environment or local laws or regulations;
- political instability, social changes, local market practices and changes;
- intellectual property legal protections and remedies;
- trade regulations;
- attracting and retaining qualified employees and independent contractors including distributors;
- export and import and exchange controls;
- weak legal systems which may affect our ability to enforce contractual rights;

International operations also require us to devote significant management resources to implement our controls and systems in new markets, to comply with the U.S. Foreign Corrupt Practices Act and similar anti-corruption laws in non-U.S. jurisdictions and to overcome challenges based on differing languages and cultures.

108.    On March 30, 2017, Psychemedics filed its Schedule 14A Proxy Statement with the SEC ("2017 Proxy"). The 2017 Proxy announced that the Company had created a new, one-member committee to oversee the Company's operations in Brazil and other international markets. The committee description states as follows:

### Brazil Oversight Committee

The Brazil Oversight Committee, whose sole member is Mr. Weinert, is responsible for corporate governance oversight of the Company's operations in Brazil, including oversight of the Company's relationship with its Brazil distributor and issues relating to the Company's international operations generally. The Brazil Oversight Committee does not have a charter.

109.    The Company's post-Class Period statements thus confirmed the Brazilian market's importance to Psychemedics, acknowledged that the Company faced new competition in that country, and revealed that the Board would now oversee the Company's relationship with

35

Psychemedics Brasil – something that was previously left to Defendant Kubacki and other top executives.

## ADDITIONAL SCIENTER ALLEGATIONS

110.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

111.    Plaintiff's allegations concerning Defendants' materially false and misleading statements and omissions and Defendants' scienter are based, in part, upon interviews with former Psychemedics' employees.   Confidential witnesses described the importance of the Brazilian opportunity to Psychemedics, and explained that Defendant Kubacki was personally involved in overseeing the expansion in Brazil, including the development of Psychemedics Brasil's collection network.

**Confidential Witness No. 1.**

112.    Confidential Witness 1 ("CW1") was hired by Psychemedics in January 2011 as a vice president in charge of inside sales and client sales.   CW1 was promoted to vice president of sales, inside sales, client services and operations at Psychemedics in September 2014.   CW1 oversaw more than 20 Psychemedics' employees in that role.   CW1's employment with Psychemedics ended in June 2015.

113.    During CW1's employment with Psychemedics, CW1 had regular, direct contact with Defendant Kubacki during the Class Period.   CW1 also had regular, direct contact with non-defendant Dyke, who was heavily involved in the Company's efforts to expand into Brazil.

CW1 described communicating with Kubacki on a weekly basis either through emails or visits to CW1's office. CW1 reported directly to Dyke.

114.    CW1 was responsible for responding to requests for proposals from clients that wanted to drug test their employees. CW1 was personally involved in Psychemedics' attempts to win business in Brazil together with Psychemedics Brasil.  CW1 explained that Psychemedics invested millions of dollars in a drug-test collection network and planned an additional laboratory in Brazil to conduct drugs tests using hair samples.

115.    CW1 described Dyke and Defendant Kubacki as the "main executives working on the [Psychemedics Brasil distribution] contract through its sales division."

116.    CW1 described Defendant Kubacki as a "micromanager" who "knew everything going on in the company."  This was possible because, according to CW1, at its high point in 2015 Psychemedics employed approximately 150 people.  In June 2015, Psychemedics laid off 24 percent of its workforce, leaving the entire Company with approximately 120 employees. After the layoffs, the Company employed approximately 10 people at its Massachusetts headquarters, approximately 20 to 25 people at its Dallas fulfillment center, and approximately 70 to 90 at its California testing lab.  CW1 stated that Defendant Kubacki oversaw them all.

117.    CW1 also explained that Kubacki was involved in setting up the Company's collection network in Brazil.  CW1 knew of three visits that Kubacki made to Brazil over a nine month period from mid-2014 to early 2015 to develop Psychemedics Brasil's collection network.

118.    CW1 described the importance of the collection network to Psychemedics' ability to expand in Brazil by explaining that Psychemedics utilized a testing facility in California that depended on the use of a radioactive isotope to extract the sample from the hair.  This meant all Psychemedics testing had to be done in California, and the collection network was needed to

gather the samples, establish chain of custody, and deliver the samples for testing.   Before departing the Company in 2015, CW1 explained that over 200,000 drug test kits had already been shipped to Brazil over the course of several months.

**Confidential Witness No. 2**

119.    Confidential Witness 2 ("CW2") worked as a special projects manager at Psychemedics from February 2014 to August 2014.   CW2 managed a $6 million project to set up a 16,000-square-foot hair testing lab. CW2 explained that Company was focused on the Brazilian expansion, and Defendant Kubacki and Lerner took a hands-on approach to overseeing the expanding operations.

120.    CW2 participated in weekly telephone conference calls with Defendant Kubacki, Dyke and other top executives to discuss the lab expansion project.  CW2 described Kubacki as consistently placing pressure on Psychemedics' employees to have the lab ready for the expected increase in testing volumes when the Brazilian mandate became effective on July 1, 2014.

121.    CW2 stated that Kubacki and Lerner referred to a "local representative" in Brazil that was helping the Company with its contacts in the country.   CW2 stated the "local representative" was not an employee of Psychemedics or Psychemedics Brasil. Instead, the local representative worked for an "affiliated company" in Brazil.

**Defendant Kubacki's Compensation Depended on a Successful Expansion in Brazil**

122.    Throughout the Class Period, Psychemedics' executives' annual compensation was tied closely to the Company's success in Brasil.  Psychemedics told investors it designed its executive compensation program to "reward achievement of specific annual performance goals by the Company."   This compensation structure created an incentive for Defendant Kubacki to

cause and allow Psychemedics to profit from the unlawful, anticompetitive conduct of Psychemedics Brasil.

123.    From at least 2014 to 2016, Psychemedics provided its executives with an opportunity to earn up to 25% of their base salary as follows: (i) up to ten percent (10%) of base salary would be payable if the Company achieved pre-determined revenue and earnings per share targets; (ii) up to an additional ten percent (10%) of base salary would be payable based on achievement of individual written performance objectives; and (iii) up to an additional five percent (5%) of base salary would be payable based upon the Company's achievement of a specific strategic objective.

124.    The Compensation Committee could also grant Stock Awards to the executives based on "their individual performance and the Company's performance for the year proceeding the year of grant."   Option Awards could also be granted based upon the individual's performance.

125.    The annual compensation of Defendant Kubacki is set forth in the table below:

| Year | Salary | Bonus | Stock Award | Option Awards | All other compensation | Total |
|------|--------|-------|-------------|---------------|------------------------|-------|
| 2014 | $429,510 | $107,377 | $194,610 | | $6,750 | $738,247 |
| 2015 | $450,000 | $45,000 | $185,150 | $42,020 | $10,600 | $732,770 |
| 2016 | $462,500 | $118,750 | | $98,280 | $10,600 | $690,130 |

126.    Defendant Kubacki's compensation – and particularly the form of his compensation – tracked closely with the Company's expansion in the Brazilian market.  In 2014, the year the Company began its expansion in Brazil, Kubacki received his full 25% cash bonus, along with a substantial discretionary Stock Award of $194,610 based on his performance and

that of Psychemedics. It is during this time that the collection networks were set up and the capacity was being expanded to handle the increase samples received from Brazil.

127. In 2015, as the Company's stock price slumped while waiting for the Brazilian mandate to take effect, Kubacki received only 10% of his base salary as a bonus. However, Kubacki received a substantial Stock Award and, for the first time in at least 10 years, the Compensation Committee awarded Kubacki a substantial discretionary Option Award of $42,020. This option award was made "in connection with a special project relating to the Company's opportunity in Brazil." So while Kubacki received less than $500,000 in cash, he received over $225,000 in equity awards, which would be poised to rise in value if Psychemedics could cash in on the Brazilian expansion.

128. In 2016, Psychemedics produced record results, and Kubacki received his full 25% cash bonus. However, while Kubacki did receive an Option Award of $98,280, he received no Stock Award for the first time since 2009 and his annual total declined to its lowest level in years. Kubacki's reduced 2016 compensation was inconsistent with the Company's record performance over that time, in contravention of the Company's stated policy. The decline in discretionary payment did, however, coincide with the commencement of legal claims in Brazil that alleged Psychemedics Brasil was profiting from anticompetitive conduct.

### NO SAFE HARBOR

129. Psychemedics' "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. Since most of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no applicability. To the extent that known trends should

have been included in the Company's financial reports prepared in accordance with GAAP, they are excluded from the protection of the statutory Safe Harbor. 15 U.S.C. §78u-5(b)(2)(A).

130.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Psychemedics who knew that the FLS was false. In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading. Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized and/or failed to provide meaningful disclosures of the relevant risks.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

131.    Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are primarily predicated upon omissions of material facts which there was a duty to disclose. Specifically, Plaintiff is entitled to a presumption of reliance throughout the Class Period because, as more fully alleged herein, Defendants failed to disclose material information regarding its expansion in the Brazilian market in the wake of mandatory hair drug testing for all professional drivers.

132.    Plaintiff also is entitled to a presumption of reliance under the fraud-on-the-market doctrine for Defendants' material misrepresentations because the market for Psychemedics' publicly traded common stock was open, well-developed, and efficient at all relevant times. As a result of these materially false and misleading statements, Psychemedics' publicly traded common stock traded at artificially inflated prices throughout the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Psychemedics' publicly traded common stock during the Class Period in reliance upon the integrity of the

market price of that common stock and the market information relating to Psychemedics, and have been damaged thereby.

133.    At all relevant times, the market for Psychemedics' common stock was an efficient market for the following reasons, among others:

(a)    Psychemedics' stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    The Company had 5.46 million shares outstanding as of January 31, 2017. During the Class Period, on average, 18,876 shares of Psychemedics stock were traded on a daily basis, demonstrating a very active and broad market for Psychemedics stock and permitting a very strong presumption of an efficient market;

(c)    as a regulated issuer, Psychemedics filed periodic public reports with the SEC;

(d)    Psychemedics regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services; and

(e)    unexpected material news about Psychemedics was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

134.    As a result of the foregoing, the market for Psychemedics common stock promptly digested current information regarding Psychemedics from publicly available sources and reflected such information in Psychemedics' stock price.  Under these circumstances, all purchasers of Psychemedics common stock during the Class Period suffered similar injury through their purchase of Psychemedics common stock at artificially inflated prices, and a presumption of reliance applies.

**LOSS CAUSATION**

135.    During the Class Period, Defendants misled the investing public by issuing false

and misleading statements and failing to disclose material facts necessary to render such

statements non-misleading, which artificially inflated the trading price of the Company's stock.

These statements and omissions had their intended effect of preventing the market from learning

the truth about Psychemedics' reliance on unlawful, anticompetitive conduct to increase its sales

in Brazil and the risks associated with an adverse ruling in the lawsuit against Psychemedics

Brasil, thereby sustaining the artificially inflated share price throughout the Class Period.

136.    Accordingly, during the Class Period, the trading price of Psychemedics

common stock increased as Defendants disseminated false and misleading statements about the

Company's opportunity and efforts to expand in the Brazilian market, and then declined as the

truth was revealed, reflecting the dissipation of the artificial inflation and causing damages to

Plaintiff and the other members of the Class.

137.    The rise and decline in price of Psychemedics' common stock during the Class

Period was the direct result of the nature and extent of the misrepresentations made to investors.

Thus, the revelation of the truth during the Class Period, as well as the resulting market reaction

and common stock trading price, confirm that the market was not previously aware of the

allegations of wrongdoing leveled against Psychemedics Brasil, or the risks to Psychemedics'

operations by virtue of its partnership with its exclusive Brazilian distributor.

138.    Consequently, the material misrepresentations and omissions alleged directly or

proximately caused, or were a substantial contributing cause of, damages sustained by Plaintiff

and the other members of the Class.  Indeed, these materially false and misleading statements

caused Plaintiff and the other members of the Class to purchase Psychemedics common stock at

artificially inflated prices, causing the damages complained of herein.  Were it not for such

materially false and misleading statements and omissions, Plaintiff and the other members of the Class would not have purchased Psychemedics common at artificially inflated prices or perhaps at all.

## CLASS ACTION ALLEGATIONS

139.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the publicly traded common stock of Psychemedics between February 10, 2014 and January 31, 2017, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

140.    Psychemedics has millions of shares of stock outstanding, and  the Company's shares were actively traded on the NASDAQ. Members of the Class are so numerous that joinder of all members is impracticable.  According to Psychemedics' SEC filings, during the Class Period, Psychemedics had approximately 5.4 million shares outstanding.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number at least in the thousands and that they are geographically dispersed.

141.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

142.    Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel experienced and competent in class actions and securities litigation. Plaintiff has no interests that are contrary to, or in conflict with, the members of the Class it seeks to represent.

143.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

144.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the federal securities laws as alleged herein;

(b)     whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)     whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)     whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e)     whether Defendants acted willfully, with knowledge or severe recklessness, in omitting and/or misrepresenting material facts;

(f)     whether the market prices of Psychemedics' common stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)     whether the members of the Class have sustained damages as a result of the decline in value of Psychemedics' stock when the truth was revealed and the artificial inflation came out, and, if so, what is the appropriate measure of damages.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

145.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

146.    During the Class Period, Psychemedics and Defendant Kubacki, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price of Psychemedics common stock; (b) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (c) cause Plaintiff and other members of the Class to purchase Psychemedics common stock at artificially inflated prices; and (d) cause them losses when the truth was revealed.  In furtherance of this unlawful scheme, plan and course of conduct, Psychemedics and Defendant Kubacki, and each of them, took the actions set forth herein in violation of §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

147.    In addition to the duties of full disclosure imposed on Psychemedics and Defendant Kubacki as a result of their affirmative false and misleading statements to the investing public, these Defendants had a duty to promptly disseminate truthful information with respect to Psychemedics' operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the

Company's revenue and earnings trends, so that the market price of the Company's securities would be based on truthful, complete and accurate information.  SEC Regulations S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.).

148.    Psychemedics and Defendant Kubacki had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

149.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Psychemedics common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Psychemedics common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by Psychemedics and Defendant Kubacki, or upon the integrity of the market in which the shares traded, Plaintiff and other members of the Class purchased Psychemedics stock during the Class Period at artificially inflated prices and, when the truth was revealed, were damaged thereby.

150.    Had Plaintiff and the other members of the Class and the marketplace known of the true facts, which were knowingly or recklessly concealed by Psychemedics and Defendant Kubacki, Plaintiff and the other members of the Class would not have purchased or otherwise acquired Psychemedics stock during the Class Period, or if they had acquired such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

151.    By virtue of the foregoing, Psychemedics and Defendant Kubacki have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  17 C.F.R. §240.10-5.

**COUNT II**

**For Violation of §20(a) of the Exchange Act
Against Defendant Kubacki**

152.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

153.    Defendant Kubacki had control over Psychemedics and made the material false and misleading statements and omissions on behalf of Psychemedics within the meaning of §20(a) of the Exchange Act as alleged herein.   By virtue of his executive position, board membership, and stock ownership, as alleged above, Defendant Kubacki had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and misleading.   Defendant Kubacki was provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

154.    In particular, Defendant Kubacki had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

155.    By reason of such wrongful conduct, each of Defendant Kubacki is liable pursuant to §20(a) of the Exchange Act.   As a direct and proximate result of Defendant Kubacki's wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of the Class, prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: June 2, 2017.

**HUTCHINGS BARSAMIAN MANDELCORN, LLP**

***/s/Theodore M. Hess-Mahan***
Theodore M. Hess-Mahan, BBO #557109
110 Cedar Street, Suite 250
Wellesley Hills, MA 02481
Telephone: (781) 431-2231
Facsimile: (781) 431-8276
thess-mahan@hutchingsbarsamian.com

*Liaison Counsel for the Class*

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood
Hui M. Chang
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665

Email: jalieberman@pomlaw.com
ahood@pomlaw.com
hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

**HOLZER & HOLZER LLC**
Corey D. Holzer
1200 Ashwood Parkway, Suite 410
Atlanta, Georgia 30338
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
Email: cholzer@holzerlaw.com

*Co-Lead Counsel for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on June 2, 2017.

*/s/Theodore M. Hess-Mahan*
Theodore M. Hess-Mahan