UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 17-10186-RGS

IN RE PSYCHEMEDICS CORP.
SECURITIES LITIGATION

MEMORANDUM AND ORDER
ON DEFENDANTS' MOTION TO DISMISS

November 7, 2017

STEARNS, D.J.

Defendants Psychemedics Corp. and Raymond Kubacki, Psychemedics' Chief Executive Officer (CEO), move to dismiss this putative securities fraud class action brought against them by plaintiff Mary Kathleen Hermann on behalf of all other similarly situated holders of Psychemedics stock during the proposed class period for alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.* The Complaint alleges that Psychemedics misled investors by failing to disclose that its independent distributor in Brazil, Psychemedics Brasil, had become secretly entwined in a cartel scheme with a competitor in violation of Brazilian law, the eventual public disclosure of which precipitated a steep drop in Psychemedics' stock price. Because the Complaint fails to allege any facts that give rise to an inference that Psychemedics had any inkling of the Brazilian scheme during the time period it is accused of failing to bring its

existence to light, and because plaintiff's other efforts to establish scienter are speculative and unconvincing, the court will grant the motion to dismiss.

BACKGROUND

Psychemedics, a Delaware corporation with its headquarters in Acton, Massachusetts, provides clinical laboratory services for the detection of illicit drugs, including hair testing. Psychemedics maintains two laboratories in Culver City, California, where hair samples are sent to be tested. The company does business in a number of countries, including Brazil, where a company named Psychemedics Brasil had the exclusive right to distribute Psychemedics' services.[1] In 2013, the Brazilian government announced its

---

[1] Unless otherwise noted, "Psychemedics" as used in this opinion refers to defendant Psychemedics, a U.S. company, while "Psychemedics Brasil" refers to the independent Brazilian distributor, which is not a party to this case. The Complaint uses ambiguous, and at times conflicting, descriptive language that muddies the waters as to the precise relationship between Psychemedics and Psychemedics USA. *See* Compl. ¶ 2 (describing the Brazilian company as an "affiliate" of Psychemedics); *id.* ¶¶ 4, 15 (alleging that the Brazilian company was Psychemedics' "exclusive distributor"); ¶ 24 (stating that Psychemedics Brasil describes itself on its website as Psychemedics' "legal representative" in the country); ¶ 44 (citing a February 10, 2014 press release from Kubacki describing Psychemedics Brasil as "a Brazilian-owned independent distributor"). At oral argument on the motion to dismiss, plaintiff's counsel described the relationship as one of "agency," with Psychemedics Brasil operating as the American company's "sales arm," and that it was "not a coincidence" that the two entities shared the same name. Defendant's counsel identified Pyschemedics Brasil as the American company's "liaison to doing business in Brazil," while emphasizing that the two entities are independent and that Psychemedics did not have an ownership stake in its Brazilian namesake. Construing the facts in the light

intention to require all professional motor vehicle drivers to submit to a hair drug test when applying to have their licenses renewed. This proposed new rule presented Psychemedics with a golden opportunity, leading company spokespersons to effuse over the potential for expansion of future business in Brazil. These sanguine statements to investors and shareholders form the basis of the lawsuit.

On December 3, 2013, the day that the Brazilian government announced the anti-drug motorist initiative,[2] Psychemedics' Corporate Vice-President of Sales and Marketing, Jim Dyke, stated in a press release that Psychemedics Brasil was "a very strong partner . . . who we have worked closely with for over 15 years," and that both companies "look[ed] forward to continuing to work together on this new opportunity." Compl. ¶ 6. The press release also quoted Marcello Santos Rachlyn, the President of Psychemedics Brasil, as saying, "[w]e have been extremely pleased to work closely with

---

most favorable to the plaintiff as the non-moving party, the court assumes that Psychemedics Brasil operated as Psychemedics' exclusive distributor in Brazil, with which the defendant had a longstanding and "close" working relationship. Compl. ¶ 6. However, there are no allegations of a corporate relationship such as parent-subsidiary, or that the two companies comingled assets or shared their management personnel.

[2] For various reasons not directly pertinent to this case, implementation of the hair-testing requirement was delayed several times. The mandate did not ultimately go into effect until the beginning of 2016. Compl. ¶ 37.

Psychemedics Corporation for the past 15 years." *Id.* ¶ 26. A February 10, 2014 press release issued by Psychemedics quoted Kubacki as saying that Psychemedics was "very excited about competing for the hair testing business in Brazil." *Id.* ¶ 42.

Various other press releases, as well as Psychemedics' Form 10-K filings with the SEC, described Psychemedics' business in rosy terms, noting that while the company "competes with other hair testing laboratories," it "distinguishes itself from hair testing competitors by emphasizing the superior results the Company obtains through use of its unique patented extraction method," *Id.* ¶¶ 14, 65, 77. Subsequent press releases emphasized to investors Psychemedics intent to "compete" for a greater share of the Brazilian hair testing market if and when the testing requirement was imposed. *Id.* ¶¶ 53, 55, 82.

Several of these press releases also described investments in equipment and facilities that Psychemedics had made in anticipation of the increase in orders that would (presumably) flow from the implementation of the drug testing mandate. In addition to these public statements, "confidential" witnesses cited in the Complaint noted that Kubacki traveled to Brazil on various occasions between mid-2014 and early 2015 "to assist Psychemedics Brasil develop and expand its collection network." *Id.*

¶ 9. Finally, when the mandatory testing regime launched in the first quarter of 2016, Psychemedics informed investors on April 26, 2016, in a press release, that the company was "already seeing a meaningful pickup of testing volume," and referenced a statement by Kubacki assuring shareholders that the company was "aggressively competing" for new business in Brazil. *Id.* ¶ 82.

The difficulty with all these statements, according to the plaintiff, is that they failed to disclose that Psychemedics was reaping the benefits of an illicit arrangement between Psychemedics Brasil and its ostensible rival, Omega Brasil. In essence, Omega Brasil had been bribed to steer exclusive contracts for drug collection points to Psychemedics at the expense of Omega USA, for whom Omega Brasil served as an in-country distributor. This corrupt arrangement had been facilitated by family relationships among employees of the two Brazilian companies, and had virtually eliminated market competition for the supply of hair testing products and services. In other words, plaintiffs argue that the ebullient statements touting Psychemedics' prospects for capturing a substantial share of the expected expansion of the Brazilian market for hair testing services were misleading because the Brazilian distributor was "cheating – not competing – in order

5

to expand Psychemedics' collection network and win new business in Brazil." Pl.'s Opp'n at 6.

Omega USA, disgruntled by the rumors that it had been betrayed by its Brazilian distributor, undertook a confirmatory investigation and pursued remedies in the Brazilian courts against both Omega Brasil and Psychemedics Brasil, alleging violations of Brazil's anti-competition laws.[3] Compl. ¶¶ 36-40. While the court pleadings were publicly available in Portuguese, the Complaint alleges that the legal proceedings in Brazil were a *camera obscura* to investors in the United States because of the language barrier and the lack of English-language media coverage. *Id.* ¶¶ 38-39.

On January 20, 2017, a Brazilian judge ruled in favor of Omega USA, finding that Psychemedics Brasil and Omega Brasil had conspired against Omega USA, effectively shutting it out of the Brazilian hair-testing market. *Id.* ¶ 11. The judge ordered Psychemedics Brasil and Omega Brasil to indemnify Omega USA for a then-undetermined amount of lost profits. On January 31, 2017, a Brazilian law firm representing Omega USA issued a press release celebrating the judgment that the firm had won. *Id.* ¶ 12. The

---

[3] The Brazilian lawsuit was initially filed by Omega Brasil, which alleged that Omega USA had unlawfully terminated their distribution agreement. Compl. ¶ 38. Omega USA then filed a counterclaim that accused Omega Brasil and Psychemedics Brasil of anticompetitive practices. *Id.* ¶ 39.

firm's announcement was picked up and published by Bloomberg, which added that Psychemedics Brasil was facing further investigation by Brazil's Administrative Council for Economic Defense for engaging in "cartel practices." *Id.* ¶ 98.

The Bloomberg report, disclosing the existence of the scheme and the Brazilian court ruling – had an insalubrious effect on Psychemedics' stock price, which dropped from an intraday high of $25.87 per share on January 31, 2017, to a low of $13.83 against a 5,000% increase in trading volume from the previous day. *Id.* ¶ 101. The stock closed out the day at $18.87 per share, representing a loss of more than 25% of its opening price. *Id.* The plaintiff pounced two days later, filing the original Complaint in this court (the amended version of the Complaint was filed on June 2, 2017). The prospective class consists of all purchasers of Psychemedics common stock between February 10, 2014, and January 31, 2017. Psychemedics now moves to dismiss. The court heard oral argument on October 19, 2017.

## DISCUSSION

To state a claim under section 10(b) and its corresponding rule, a plaintiff must allege: "(1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Miss. Pub. Employees Retirement*

7

*Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 85 (1st Cir. 2008). The Private Securities Litigation Reform Act of 1995 (PSLRA) supplies the pleading standards a court is to apply in securities fraud cases. Under these standards, a plaintiff must specify each statement or omission that is allegedly misleading, explain why each statement or omission is deceitful or disingenuous, and provide factual support for the allegations of fraud. *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193-194 (1st Cir. 1999).

Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). A defendant may also have the requisite mental state if it "acted with a high degree of recklessness." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002). "Recklessness, as used in this context, 'does not include ordinary negligence, but is closer to being a lesser form of intent.'" *Fire & Police Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 240 (1st Cir. 2015) (quoting *Greebel*, 194 F.3d at 188). Thus, "a defendant can be held liable for 'a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of

it.'" *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 757 (1st Cir. 2011) (quoting *Greebel*, 194 F.3d at 198).

Allegations of scienter are subject to a heightened pleading standard under the PSLRA. *See Greebel*, 194 F.3d at 195. Consequently, plaintiff must, "with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The requisite "strong inference" exists where that inference is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). As this formulation implies, courts must evaluate "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Id.* at 314.

The critical defect here is that the Complaint is devoid of any factual allegations that would tend to support an inference (much less direct evidence) that Psychemedics knew of the anti-competitive cabal between Psychemedics Brasil and Omega Brasil prior to it coming to light in the Brazilian lawsuit. Instead, the Complaint simply asks the court to assume knowledge on the part of Psychemedics and to impute a concomitant duty of

disclosure to investors. A few examples from the Complaint give a flavor of plaintiff's inverse logic:[4]

> 2. Specifically, Defendants misled investors by concealing from them the fact that, through its affiliate Psychemedics Brasil Exames Toxicologicos Ltda. ("Psychemedics Brasil"), the Company participated in and benefitted from an unlawful scheme to monopolize the Brazilian hair drug test market in violation of Brazilian law.
>
> 10. Defendant Kubacki claimed Psychemedics was "aggressively competing" for business in Brazil, but failed to disclose that Psychemedics Brasil's success was driven by unlawful, anticompetitive conduct.
>
> 15. As alleged herein, Psychemedics and Defendant Kubacki knowingly concealed from investors that the Company's exclusive distributor in Brazil was conspiring with a competitor to limit market participation in Brazil.
>
> 42. Psychemedics concealed from investors the fact that its Brazilian expansion would benefit from its exclusive distributor's anticompetitive practices, which violated Brazilian law.

The common skein running through all these allegations is that Psychemedics knew, or must have known, of its distributor's wrongdoing, yet

---

[4] In the classic example of a categorical syllogism (if A is part of C then B is part of C), we begin with the major premise that all men are mortal, followed by the minor premise that Socrates is a man, and the logical conclusion that Socrates therefore is mortal. In plaintiff's syllogistic fallacy (drawing an affirmative conclusion from a negative premise) we start with the negative premise that Psychemedics failed in its duty to disclose, then proceed to the affirmative proposition that a party can violate the duty to disclose only if it possesses fraudulent intent, and draw from this the conclusion that Psychemedics therefore possessed scienter.

there are no factual allegations even suggesting that that was the case. The Complaint instead iterates, in conclusory fashion, that Psychemedics must have known of the illegal arrangement between two independent Brazilian companies (neither of whom is a party to the case), despite the absence of evidence that Psychemedics had any inkling of the scheme prior to publication of the Bloomberg report.

It is axiomatic that "defendants cannot have committed fraud if they did not know at the time that the failure to provide additional information was misleading." *New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 48 (1st Cir. 2008); *see also Miss. Pub. Employees' Retirement Sys.*, 523 F.3d at 86 ("Securities actions raise questions of what corporate managers knew and when they knew it."). As Judge Saylor observed in a recent case, "a complaint is insufficient under the PSLRA if it does not contain particularized factual allegations raising a strong inference that *at the time of disclosure* defendants knew (or were reckless by not knowing) that their failure to provide additional information was misleading." *Brennan v. Zafgen, Inc.*, 199 F. Supp. 3d 444, 451 (D. Mass. 2016), *aff'd,* 853 F.3d 606 (1st Cir. 2017).

Apparently recognizing the thin soup of the Complaint, plaintiff invokes a number of alternative legal theories and bits of evidence that she

says support an inference of scienter. Ensemble, she argues, these shards are sufficient to put her beyond the pleading stage. As a general matter, a plaintiff is perfectly entitled to point to an accumulation of pieces of indirect evidence for purposes of establishing scienter. *See, e.g., Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002) (noting that a "plaintiff may combine various facts and circumstances indicating fraudulent intent to show a strong inference of scienter."). However, "where a complaint is devoid of any direct-evidence allegations, the indirect-evidence allegations in the complaint will need to do more work to carry the burden of raising a 'strong inference of scienter' on their own." *Brennan,* 853 F.3d at 615 n. 8.

Plaintiff's first alternative argument is that principles of agency are sufficient to find scienter because Psychemedics Brasil's wrongful acts are "imput[able] to" Psychemedics. Pl.'s Opp'n at 8. In support of this theory, she cites *In re Cabletron Sys., Inc.,* 311 F.3d 11, 40 (1st Cir. 2002), where the First Circuit found that "[t]he scienter allegations against the company's agents is enough to plead scienter for the company." *Id.* at 40. However, in *Cabletron*, the First Circuit was addressing statements made by the defendant company's corporate officers and executives. The district court cases cited by the plaintiff are of the same ilk. *See, e.g., In Re Brooks Automation, Inc. Sec. Litig.*, 2007 WL 4754051, at *12 (D. Mass. Nov. 6,

12

2007) (scienter allegations against the former CEO and two members of the compensation committee of a publicly-traded semiconductor company "may be imputed to [the company] for the purpose of establishing [the company's] fraudulent intent.").

Applying this accepted legal principle to the facts of the instant case, had the plaintiff alleged, for example, that Kubacki's statements were made with the requisite level of scienter – and had the facts as alleged shown that he knew about the corrupt arrangement between Psychemedics Brasil and Omega Brasil – then as the company CEO, his scienter could be imputed to Psychemedics. It is an altogether different proposition to say that the fraudulent actions or statements undertaken by corporate officers in Company A can support not only a claim of scienter against Company A, but also against Company B, absent an alter-ego relationship. Allowing this type of layering would be even more questionable in a case like this one where the companies are separate entities that do not operate in a parent-subsidiary context no matter how "close" their working relationship.[5]

---

[5] The court is not convinced by the plaintiff's suggestion that "[t]he Complaint is replete with allegations demonstrating Psychemedics' control over its extremely close corporate relationship with Psychemedics Brasil, which establishes the existence of an agency relationship." Pl.s' Opp'n at 9. Certainly the Complaint alleges that Psychemedics was thrilled over the Brazilian government's proposed hair-testing rule and frequently praised the efforts of its Brazilian distributor to expand Psychemedics' Brazilian market;

Next, the plaintiff argues that the "core operations doctrine" supports a finding of scienter. *See Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 19 (D. Mass. 2004) ("[I]t can be inferred that top executives at [the company] were aware of a scheme involving systemically fraudulent sales practices given the importance" of the sale at issue to the company's bottom line). The First Circuit has to this point declined to enumerate the ways in which "core operations" might give rise to a strong inference of scienter, *see In Re Biogen Inc. Sec. Litig.*, 857 F. 3d 34, 44 (1st Cir. 2017) (declining to reach the question "because the allegations" of core operations clearly fall short).

However, even in *Crowell*, the court did not find that a particular sale or investment, however much a "core" concern of the company was, standing

---

it might even be fair to say that in its eagerness to preserve its Brazilian foothold, it went to great lengths to "control . . . its extremely close corporate relationship with Psychemedics Brasil." But control and management of a relationship is distinct from control and management of another party to the extent that the other party "acts as a representative of or otherwise acts on behalf of another person with power to affect the legal rights and duties of the other person." *See* Restatement (Third) of Agency § 1.01 cmt. c (2006). The plaintiff's effort to tie two distinct corporate entities together through some vague allegations of "closeness" also runs headlong into the established principle that "the 'presumption of corporate separateness' is difficult to overcome . . . [and] conclusory allegations do not suffice." *Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. Kg.,* 295 F.3d 59, 66 (1st Cir. 2002) (quoting *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1091 (1st Cir. 1992)).

alone, sufficient to establish scienter. As this court noted in a subsequent case, the "core operations" theory in *Crowell* was "buttressed by a 'plus factor' — an email pointing to the company's vice president as the author of the scheme." *In re A123 Sys., Inc. Sec. Litig.*, 930 F. Supp. 2d 278, 285 (D. Mass. 2013) (citing *Crowell*, 348 F. Supp. 2d at 19). In the present case, plaintiff's "core operations" theory stands naked, unadorned by any other piece of evidence purporting to establish the essential "plus" factor – guilty knowledge on the part of Kubacki or Psychemedics.

Drawing the next arrow from her quiver, plaintiff trots out "confidential" (*i.e.*, anonymous) witness statements emphasizing the importance of the Brazilian expansion to Psychemedics' business and characterizing Kubacki as a "micromanager" whose hands-on style make it improbable that he was not complicit to the illicit arrangement in Brazil.[6] *See* Compl. ¶ 111 ("Confidential witnesses described the importance of the Brazilian opportunity to Psychemedics, and explained that Defendant Kubacki was personally involved in overseeing the expansion in Brazil, including the development of Psychemedics Brasil's collection network.").

---

[6] Tellingly, there are no allegations in the Complaint that the two confidential witnesses themselves knew of the anti-competitive scheme, or even knew of the litigation in the Brazilian courts.

Taken together, these statements, according to the plaintiff, "place Kubacki on the ground in Brazil helping to set up the vast collection network that was the lynchpin to Psychemedics Brasil's anticompetitive conduct at the same time of the alleged wrongdoing." Pl.'s Opp'n at 15.

Even crediting these confidential witness statements as accurate, they fail to tie Kubacki himself to the anti-competitive scheme, instead asking the court to make the leap that, as an obsessive micromanager, he had to have known what the third-party distributor was up to.[7] This same argument has failed to impress other courts to which it has been made. *See, e.g., Lirette v. Shiva Corp.,* 27 F. Supp.2d 268, 283 (D. Mass. 1998) ("[G]eneral inferences that the defendants, by virtue of their position within the company, 'must have known' about the company's problems when they undertook allegedly

---

[7] At oral argument, plaintiff's counsel argued that discovery would remedy the deficiencies of the Complaint by ferreting out facts showing that Kubacki was aware of the plotting in Brazil. However, the heightened pleading standards that apply under the PSLRA reflect a deliberate choice made by Congress to bar even some possibly meritorious claims from proceeding past the pleading stage. *See Local No. 8 IBEW Ret. Plan & Trust v. Vertex Pharm., Inc.*, 838 F.3d 76, 83 n.9 (1st Cir. 2016) (acknowledging that "prior to discovery, few plaintiffs will be in a position to make specific allegations about the form of internal documents" or discussions, but also noting that Congress has nonetheless "deliberately raised the entry bar to discovery . . . through the PSLRA's heightened pleading standards" (alteration in original) (quoting *Auto. Indus. Pension Trust Fund v. Textron, Inc.* 682 F.3d 34, 40 (1st Cir. 2012)).

fraudulent actions . . . [are] inadequate to withstand the special pleading requirements in securities fraud cases.") (citing *Maldonado v. Dominguez*, 137 F.3d 1, 9 (1st Cir. 1998)).  This argument becomes even less persuasive where the misconduct in question results from actions taken by employees of a third party who are not under the micromanaging boss's direct supervision.

Finally, plaintiff argues that scienter can be inferred from the fact that defendants had a financial motive to hide the alleged fraud because their compensation was dependent on the successful outcome of the Brazilian expansion.  *See* Compl. ¶ 126 ("Defendant Kubacki's compensation – and particularly the form of his compensation – tracked closely with the Company's expansion in the Brazilian market."); Compl. ¶ 122 ("Throughout the Class Period, Psychemedics' executives' annual compensation was tied closely to the Company's success in Brasil.  . . . This compensation structure created an incentive for Defendant Kubacki to cause and allow Psychemedics to profit from the unlawful, anticompetitive conduct of Psychemedics Brasil.").  This argument, too, fails, because "'the usual concern by executives to improve financial results' does not support an inference of scienter" without "something more."  *Corban v. Sarepta Therapeutics, Inc.*, 868 F.3d 31, 41-42 (1st Cir. 2017) (quoting *In Re Cabletron*, 311 F.3d at 39)).  It is not

17

enough for a plaintiff to point to "the ever present desire to improve results," *id.*, as supporting a motive to commit fraud, particularly when it is a common practice for executive compensation to be linked to performance. *See In re Smith & Wesson Holding Corp. Sec. Litig*, 604 F. Supp. 2d 332, 344 (D. Mass. 2009) ("That the executives may have gained some compensation is not enough [under the PSLRA], since stock-based compensation is a common feature of pay packages and executives already have an incentive to provide value to their shareholders."). In sum, the mere fact that defendants stood to gain from the success of the company's planned expansion into Brazil, and that they therefore may have had an incentive to hide fraud (which they may or may not have known about), does not support an inference of scienter that is "as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

### ORDER

For the foregoing reasons, defendants' motion to dismiss is <u>ALLOWED</u>. The Clerk will enter judgment accordingly and close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE